**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

In re:

DENICE PATRICIA MADRID-BASKIN,

Debtor.

Bankruptcy Case No. 20-10069 TBM
Chapter 13

_____

**ORDER DENYING CONFIRMATION OF DEBTOR'S AMENDED CHAPTER 13 PLAN**
_____

### I.  Introduction.

In 2017, Debtor Denice Patricia Madrid-Baskin (the "Debtor") bought a used Honda Accord (the "Car").  She agreed to pay a total of $14,626.  Such amount covered the price of the Car plus some additional assorted charges, including $295 for "gap waiver or gap coverage insurance" (the "GAP Insurance").  She put $3,250 down and borrowed the rest under a loan secured by the Car.  And, she committed to pay off the principal balance, plus interest, to the assignee of the loan:  Westlake Services, LLC d/b/a Westlake Financial Services ("Westlake Financial").

A few years later, the Debtor filed for protection under Chapter 13 of the Bankruptcy Code.  Westlake Financial submitted a secured proof of claim for $10,537.  Then, the Debtor filed a Chapter 13 Plan.  She proposed to pay Westlake Financial only the "confirmation value" of the Car (which she contends is $7,665), plus interest at 5% per annum over five years.  In bankruptcy vernacular, the Debtor wants to bifurcate and cram down Westlake Financial's secured claim to the current value of the Car, stripping $2,872 from Westlake Financial's secured claim and leaving the balance unsecured and unpaid.

The Chapter 13 Trustee, Douglas B. Kiel (the "Chapter 13 Trustee"), objected to the treatment of Westlake Financial under the Chapter 13 Plan.  The Chapter 13 Trustee contends that under the Bankruptcy Code's[1] so-called "hanging paragraph" (located between 11 U.S.C. §§ 1325(a)(9) and (b)(1)), the Debtor cannot strip down Westlake Financial's claim because she purchased the Car within 910 days prior to filing for bankruptcy and Westlake Financial has a purchase money security interest in the Car to the full extent of the balance of the loan (excepting only $295 attributable the GAP Insurance).  According to the Chapter 13 Trustee, the Debtor must pay Westlake Financial without cramming down the debt.

---

[1]   11 U.S.C. § 101 *et seq.*  Unless otherwise indicated, all references to "Section" are to Sections of the Bankruptcy Code.

The Debtor asks the Court to confirm the Chapter 13 Plan anyway. She concedes that she borrowed $11,376 but notes that $295 of the loan proceeds were used to purchase the GAP Insurance. She contends that Westlake Financial cannot have a purchase money security interest in the Car for the GAP Insurance part of the loan. Even the Chapter 13 Trustee agrees. But then the Debtor makes a huge leap. She argues that because the transaction involved $295 in GAP Insurance, Westlake Financial's purchase money security interest in the Car has been destroyed altogether so that the Debtor may cram down the entire debt.

The Debtor presents an aggressive and technical legal argument. However, the Court concludes that the Debtor cannot strip down the debt. Even if a portion of the loan proceeds were used to pay for the GAP Insurance, such use does not transform the entire loan into a non-purchase money obligation under Colorado law. Instead, Colorado law permits dual status: the GAP Insurance part of the loan may be considered a non-purchase money obligation, while the balance of the loan retains its character as a purchase money obligation. Thus, the Debtor cannot invoke cram-down and the Chapter 13 Plan cannot be confirmed.

## II. **Jurisdiction and Venue**.

This Court has jurisdiction to enter final judgment on the issues presented in this bankruptcy case pursuant to 28 U.S.C. § 1334. The plan confirmation dispute is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate), (b)(2)(L) (confirmation of plans), and (b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III. **Procedural Background**.

### A. **The Bankruptcy Filing and Westlake Financial's Proof of Claim**.

The Debtor filed for protection under Chapter 13 of the Bankruptcy Code on January 6, 2020.[2] Contemporaneously, she filed her Statement of Financial Affairs and Schedules.[3] Only 15 creditors filed proofs of claim in her bankruptcy case. On January

---

[2] Docket No. 1; Stip. Fact No. 1. Unless otherwise indicated, the Court will refer to particular documents from the CM/ECF docket for this Bankruptcy Case, using the convention: "Docket No. ___." The Chapter 13 Trustee and the Debtor submitted "Stipulated Facts" (Docket No. 32). When referencing a particular Stipulated Fact, the Court will use the citation: "Stip. Fact No. ___." The parties separately filed an attachment to the Stipulated Facts to which they refer as Exhibit 1 (Docket No. 33). The Court will also refer to the attachment as Exhibit 1 and use the citation: "Ex. 1." The Court notes that Exhibit 1 is Westlake Financial's Proof of Claim 3-1. In addition to the Proof of Claim form, Westlake Financial attached four supporting documents. The parties stipulated to the admissibility of Exhibit 1. (Stip. Fact No. 6.) However, the parties neither separately labeled each document nor assigned page numbers to the pages within Exhibit 1. Thus, when the Court refers to Exhibit 1 or one of the documents within it, the Court will identify it only as "Ex. 1."

[3] Docket No. 1.

27, 2020, Westlake Financial filed Proof of Claim No. 3-1 in the amount of $10,537, plus interest at the rate of 20.90% per annum, based on an automobile loan (the "Westlake Financial Claim"). The Westlake Financial Claim is the single largest claim filed against the Debtor's bankruptcy estate. Westlake Financial asserts that the debt is secured by the Car. The Debtor has not objected to the Westlake Financial Claim.

**B.     The Debtor's Chapter 13 Plan.**

On April 1, 2020, the Debtor filed an Amended Chapter 13 Plan (the "Chapter 13 Plan").[4] In the Chapter 13 Plan, the Debtor proposes to make monthly payments to the Chapter 13 Trustee of $365 for 58 months, yielding total payments of $21,170. With respect to the Westlake Financial Claim, the Debtor proposes to cram down the debt based upon the "confirmation value" of the Car.[5] The Debtor asserts that the "confirmation value" of the Car is $7,655. Thus, she contends that she should pay only that amount ($7,655) plus 5% interest per annum over 58 months which results in a "total amount payable" to Westlake Financial of $8,494.[6] In the Chapter 13 Plan, the Debtor also explained (in bankruptcy-speak): "Debtor proposes to 'cram down' her vehicle. She purchased gap insurance on the vehicle, as such, the vehicle is not all PMSI and may be crammed."

**C.     The Confirmation Process.**

The Debtor sent the Chapter 13 Plan to all creditors. Westlake Financial did not object to its treatment. However, the Chapter 13 Trustee did.[7] In the Objection, the Chapter 13 Trustee stated:

> Part 7.4.A of the plan provides for Westlake Financial['s Claim] . . . as a claim subject to "cram down" under 11 U.S.C. § 506 . . . . Debtor purchased a motor vehicle for personal use on October 27, 2017. Therefore, the vehicle was purchased within 910 days prior to filing the Petition and cannot be crammed down pursuant to 11 U.S.C. § 1325(a)(9).
>
> Part 12 of the plan states that Debtor "purchased additional gap insurance on the vehicle, as such, the vehicle is not all PMSI and may be crammed." The portion of the claim attributable to gap insurance may not be a purchase money security interest (PMSI) and not protected by the hanging paragraph of 11 U.S.C. § 1325. However, under the "dual

---

[4]     Docket No. 19; Stip. Fact No. 2.
[5]     Stip. Fact No. 2.
[6]     The Chapter 13 Plan does contemplate that any remainder owing to Westlake Financial after subtracting the $7,655 "confirmation value" of the Car may be classified as an unsecured claim. But, under the Chapter 13 Plan, unsecured creditors will receive almost nothing — only $100 to be split *pro rata* among all unsecured creditors.
[7]     Docket No. 21, the "Objection."

status" rule applied by the court in *In re McCauley*, 398 B.R. 41, 46-47 (Bankr. D. Colo. 2009), a secured obligation is divided into a PSMI and non-PSMI and the hanging paragraph of 11 U.S.C. § 1325 prevents "cram down" of the PMSI portion of the claim.[8]

The Court conducted two non-evidentiary hearings on confirmation.[9] Ultimately, the Debtor and the Chapter 13 Trustee framed the dispute as primarily "legal" (as opposed to factual) and agreed to present the Court with a set of stipulated facts rather than taking the matter to an evidentiary hearing. True to their word, the Debtor and the Chapter 13 Trustee thereafter submitted fifteen "Stipulated Facts"[10] plus an attachment, Exhibit 1.[11] They also reaffirmed that both parties "consent to a ruling by the Court on the pleadings only and no evidentiary hearing is necessary."[12] Consistent with the foregoing consents, the Court determines that no evidentiary hearing is required. Instead, for evidence, the Court will rely exclusively on the Stipulated Facts. The Court also appreciates that both the Debtor and the Chapter 13 Trustee submitted helpful briefing on the legal issues.[13] Thus, the confirmation dispute is ripe for decision.

## IV.     **Findings of Fact.**

Based on the Stipulated Facts, the Court makes the following findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052.

On October 27, 2017, the Debtor purchased the Car (a used 2012 Honda Accord) from Mister Auto.[14] To complete the purchase of the Car, Mister Auto (as Seller) and the Debtor (as Buyer) entered into and executed a "Retail Installment Contract and Security Agreement," dated October 27, 2017 (the "Contract").[15] According to the Contract, the "Cash Price" of the Car, including sales tax, was $13,994.65.[16] As part of the transaction, the Debtor also agreed to pay a few additional charges including: (1) "filing fees" paid to "public officials" of $37.20; (2) a "delivery and handling fee" of $299.00; and (3) "gap waiver or gap coverage insurance" of $295.00 from Knight Management Insurance Services.[17] Thus, the total "all-in" amount charged by Mister Auto for the "Cash Price" of the Car and additional charges was $14,625.85.[18]

The Debtor made a down payment of $3,250.00, leaving an unpaid balance of

---

8    Docket No. 21.
9    Docket Nos. 25 and 30.
10   Docket No. 32, the "Stipulated Facts."
11   Ex. 1.
12   Stip. Fact No. 4.
13   Docket Nos. 34 and 35.
14   Stip. Fact No. 5.
15   Stip. Fact No. 6 and Ex. 1.
16   Stip. Fact No. 7.
17   Stip. Fact No. 9 and Ex. 1.
18   Stip. Fact Nos. 7, 8 and 9; and Ex. 1.

$11,375.85.[19] The Court received no evidence as to how the down payment was applied (*i.e.*, as against the "Cash Price" of the Car or toward the additional charges). In any event, Mister Auto financed the unpaid balance for the Debtor through the Contract. As part of the Contract, the Debtor agreed to pay Mister Auto "the principal amount of $11,375.85" plus interest at the rate of 20.90% per annum all through 52 payments of $337.27 per month.[20] To secure her obligations to Mister Auto under the Contract, the Debtor gave Mister Auto a security interest in the Car.[21]

In terms of governing law, Mister Auto and the Debtor agreed that the Contract would be governed "by the law of Colorado and applicable federal law and regulations."[22] Furthermore, the parties agreed "to make this Contract subject to [the Colorado Uniform Consumer Credit Code], so that for purposes of the UCCC this is a consumer credit transaction . . . ."[23] The transaction closed in Colorado.

With respect to the GAP Insurance purchased by the Debtor, the Contract states:

> Additional Protections. You may buy any of the following voluntary protection plans. They are not required to obtain credit, are not a factor in the credit decision, and are not a factor in the terms of credit or the related sale of the Vehicle. The voluntary protections will not be provided unless you sign and agree to pay the additional cost.[24]

Then, the Debtor signed under the notation: "Gap Waiver or Gap Coverage; Term 52 months; Price $295." So, the Debtor obtained GAP Insurance.[25]

The same day that the parties signed the Contract, Mister Auto assigned the Contract to Westlake Financial.[26] Thus, Westlake Financial is the secured counter-party to the Contract. To evidence its security interest in the Car, Westlake Financial caused it to be listed as the "First Lienholder" on the Certificate of Title issued by the Colorado Department of Motor Vehicles.[27]

The Debtor and Westlake Financial agree that the Car is a motor vehicle that was acquired for the personal use of the Debtor within the 910-day period preceding the date of the filing of the Debtor's bankruptcy petition.[28] Furthermore, the current "replacement value" of the Car is $7,655.00.[29] Thus, the Debtor owes more under the Contract than

---

[19] Stip. Fact Nos. 8 and 10; and Ex. 1.
[20] Stip. Fact No. 10; and Ex. 1.
[21] Ex. 1.
[22] *Id.*
[23] *Id.*
[24] *Id.* and Stip. Fact Nos. 11 and 12.
[25] Ex. 1.
[26] *Id.*
[27] *Id.*
[28] Stip. Fact Nos. 13 and 14.
[29] Stip. Fact No. 15.

the Car is worth.

## V. Legal Conclusions.

### A. General Statutory Framework and Burden of Proof for Confirmation.

Chapter 13 of the Bankruptcy Code "allows a debtor to retain his property if he proposes, and gains court confirmation of, a plan to repay his debts over a three- to five-year period." *Harris v. Viegelahn*, 135 S. Ct. 1829, 1835 (2015). Under Section 1322(a)(1), a Chapter 13 plan must "provide for the submission of all or such portion of future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan." 11 U.S.C. § 1322(a)(1). For a Chapter 13 plan to be confirmed, a Chapter 13 debtor must satisfy all the requirements of Section 1325(a) plus, if there is an objection, the additional mandates of Section 1325(b).

In confirmation contests, the Debtor bears the burden of proving the required elements of Section 1325. *In re Melendez*, 597 B.R. 647, 657-58 (Bankr. D. Colo. 2019); *In re Vinger*, 540 B.R. 782, 786 (Bankr. D. Colo. 2015); *In re McDonald*, 508 B.R. 187, 205 (Bankr. D. Colo. 2014); *In re Toxvard*, 485 B.R. 423, 432 (Bankr. D. Colo. 2013). The legal standard is the preponderance of the evidence. *In re Fassi*, 2013 WL 2190158, at *1 (Bankr. D. Colo. May 21, 2013).

### B. Treatment of Claims Secured By Motor Vehicles in Chapter 13.

The treatment of secured claims in Chapter 13 can be a tricky business and requires careful consideration of a patchwork of statutes establishing both general rules and exceptions to the rules. The starting place is Section 506(a), a general statute applicable to all Chapters of the Bankruptcy Code, which states:

> (1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim . . . .
>
> (2) If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. . . . .

In the context of a Chapter 13 individual debt adjustment case in which the plan provides for secured claims, the Court is required by the statute to confirm a plan if all the requirements of Section 1325(a) are met, including:

6

> With respect to each allowed secured claim provided for by the plan —
>
> (A)    the holder of such claim has accepted the plan;
>
> (B)    (i)    the plan provides that—
>
>             (I)    the holder of such claim retain the lien securing such claim until the earlier of —
>
>                   (aa)    the payment of the underlying debt determined under nonbankruptcy law; or
>
>                   (bb)    discharge under section 1328; and
>
>             (II)    if the case under this chapter is dismissed or converted without completion of the plan, such lien shall also be retained by such holder to the extent recognized by applicable nonbankruptcy law;
>
>         (ii)    the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim . . . .; and
>
>         (iii)    if —
>
>             (I)    property to be distributed . . . is in the form of periodic payments, such payments shall be in equal monthly amounts; and
>
>             (II)    the holder of the claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to provide . . . adequate protection during the period of the plan; or
>
> (C)    the debtor surrenders the property securing such claim to such holder . . . .

11 U.S.C. § 1325(a)(5).

What do these two provisions mean together in more understandable terms? The United States Court of Appeals for the Tenth Circuit (the "Tenth Circuit") provided a helpful summary in plain English:

> [Chapter 13 debtors] . . . are normally permitted, if they wish, to bifurcate each secured debt into two claims: (1) an amount equal to the present value of the collateral, and (2) any excess. The excess portion is converted into unsecured debt. The [Chapter 13] plan can then be "crammed down," or confirmed over the secured creditor's objection so long as the creditor receives a lien securing the claim and the plan provides for payments to the creditor over the life of the plan equal to the present value of the collateral. Whether debt is secured or unsecured is significant because secured creditors generally must be repaid in full before unsecured creditors receive anything.

*Ford v. Ford Motor Credit Corp. (In re Ford)*, 574 F.3d 1279, 1282 (10th Cir. 2009). So, the general rules — Sections 506(a) and 1325(a)(5) — together allow for bifurcation and cram down or strip down. *Wachovia Dealer Servs. v. Jones (In re Jones)*, 530 F.3d 1284, 1289 (10th Cir. 2008) ("Under § 506(a), a claim secured by a lien is separated, or bifurcated, into a secured portion reflecting the value of the property and an unsecured portion reflecting the remaining debt or deficiency.").

But general rules like these come with exceptions. The principal common exception in Chapter 13 cases pertains to home mortgages. Chapter 13 debtors cannot modify the rights of "holders of secured claims . . . secured only by a security interest in real property that is the debtor's principal residence . . . ." 11 U.S.C. § 1322 (b)(2). That exception is not implicated in this dispute. However, the second-most common exception deals with motor vehicles purchased within two and a half years before bankruptcy.

That exception is at the heart of this case. Enacted in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act, Publ. L. No. 109-8, 119 Stat. 23, 80 (2005), the motor vehicle exception seems a sort of legislative largess to protect automobile dealers and financing companies. *See Ford Motor Credit Co., LLC v. Dale (In re Dale)*, 582 F.3d 568, 572 (5th Cir. 2009) (hanging paragraph enacted "[i]n apparent response to the undesirable effects of [ ] cramdown on car dealers"); *In re Duke*, 345 B.R. 806, 809 (Bankr. W.D. Ky. 2006) ("It is interesting to note that the section of BAPCPA that added [the motor vehicle exception] was entitled: 'Giving Secured Creditors Fair Treatment in Chapter 13 . . . Restoring the Foundation for Secured Credit.'").

The motor vehicle exception is a bit hard to find. Congress did not see fit to give the exception its own statutory alphanumeric designation. Instead, the legislature jammed it in a statutory netherworld between 11 U.S.C. § 1325(a)(9) and 11 U.S.C. § 1325(b)(1). Some perceptive bankruptcy judge or scholar called it the "hanging paragraph" — and the name stuck. The one-sentence hanging paragraph says this:

8

> For purposes of paragraph (5) [11 U.S.C. § 1325(a)(5)], section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day period preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle . . . acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

11 U.S.C. § 1325(a)(9)-(b)(1). For ease of reference, the Court refers to the foregoing motor vehicle exception as the "Hanging Paragraph."

Breaking the Hanging Paragraph text down into more manageable bites, the general bifurcation or cram down rules encompassed in Sections 506(a) and 1325(a)(5) do "not apply" if: (1) the creditor has a purchase money security interest securing the debt; (2) the debt was incurred within 910-days [a period that equates to roughly two and a half years] before the bankruptcy filing; and (3) the collateral consists of a motor vehicle bought for personal use of the debtor. *See Graupner v. Nuvell Credit Corp. (In re Graupner)*, 537 F.3d 1295, 1298 (11th Cir. 2008) (similar list of elements of Hanging Paragraph); *Ford*, 574 F.3d at 1282 ("The hanging paragraph protects creditors holding a 'purchase money security interest' . . . from § 506(a) bifurcation and cramdown."); *Jones*, 530 F.3d at 1289 ("the bifurcation provision of § 506 does not apply to 910 car claims); *In re Munzberg*, 388 B.R. 529, 535 (Bankr. D. Vt. 2008) (describing elements of hanging paragraph).

C. **The Hanging Paragraph Prevents Bifurcation and Cram Down of Most of the Debt Owed to Westlake Financial.**

   1. **The Debtor Contests Only the "Purchase Money Security Interest" Element of the Hanging Paragraph.**

Both the Debtor and the Chapter 13 Trustee acknowledge that most of the elements of the Hanging Paragraph exception for motor vehicles are present and undisputed. The debt owed to Westlake Financial is $10,537, plus interest at the rate of 20.90% per annum, as set forth in the Westlake Financial Claim. According to Fed. R. Bankr. P. 3001(f) "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." And, a properly filed proof of claim is "deemed allowed" unless there is an objection to it. 11 U.S.C. § 502(a). In this case, the Westlake Financial Claim is valid on its face. Further, the Debtor has not objected to either the amount or the secured nature of the Westlake Financial Claim. So, the secured debt has been established.

With respect to the 910-day time requirement contained in the Hanging Paragraph, the debt evidenced by the Westlake Financial Claim was incurred within 910 days prior to the Debtor's bankruptcy. The Debtor bought the Car on October 27, 2017. She filed for

9

bankruptcy on January 6, 2020. So, the time interval between the purchase of the Car and the bankruptcy filing was 801 days — well within the 910 statutory time period in the Hanging Paragraph. The parties also stipulated that "[t]he debt owed to [Westlake Financial] was incurred within the 910-day period preceding the date of the filing of the petition."[30]

The debt owed to Westlake Financial is secured by the Car which is a "motor vehicle" within the meaning of the Hanging Paragraph. And, the Car was purchased for the personal use of the Debtor. In the Contract, the parties confirmed that the purchase of the vehicle was a "consumer credit transaction." The parties also stipulated that the Car "is a motor vehicle that was acquired for the personal use of the Debtor."[31]

So, two out of the three elements of the Hanging Paragraph easily have been established. All that remains is a fight over the purchase money security interest part of the Hanging Paragraph. The critical question is whether Westlake Financial "has a purchase money security interest securing the debt that is the subject of the claim."

### 2. **Whether Westlake Financial Has a Purchase Money Security Interest Securing the Debt Is a Matter of State Law.**

This dispute requires the Court to engage in a statutory interpretation exercise. Although the Hanging Paragraph uses the key phrase "purchase money security interest," the Bankruptcy Code does not contain a definition of the term. In the absence of a specific statutory definition, courts are supposed to start with the "plain" or "ordinary" meaning of the text. *Clark v. Rameker*, 573 U.S. 122, 127 (2014); *Hamilton v. Lanning*, 560 U.S. 505, 513, (2010); *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) ("[w]hen terms used in a statute are undefined, we give them their ordinary meaning . . ."). However, the phrase "purchase money security interest" has no plain or ordinary meaning. Indeed, most Americans faced with that four-word combination probably think of it as some sort of indecipherable legalese. The United States Court of Appeals for the Fifth Circuit characterized the phrase "purchase money security interest" as "a term of art." *Dale*, 582 F.3d at 573. Strange art at that.

Lacking a Bankruptcy Code definition and any plain or ordinary meaning, a pair of binding Tenth Circuit decisions instruct the Court to resort to state law. *Ford*, 574 F.3d at 1283 (applying Kansas UCC to interpret purchase money security interest in Hanging Paragraph); *Billings v. AVCO Colo. Indus. Bank (In re Billings)*, 838 F.2d 405 (10th Cir. 1988) (applying Colorado UCC to construe purchase money security interest in Section 522(f)). Other appellate decisions are in accord. *See Dale*, 582 F.3d at 573 (applying Texas UCC in construing Hanging Paragraph purchase money security interest requirement); *Wells Fargo Fin. Acceptance v. Price (In re Price)*, 562 F.3d 618, 624 (4th Cir. 2009) (applying North Carolina UCC when considering purchase money security interest under Hanging Paragraph); *Reiber v. GMAC, LLC (In re Peaslee)*, 547 F.3d 177,

---

[30] Stip. Fact No. 13.
[31] Stip. Fact No. 14.

184 (2nd Cir. 2008) ("state law governs the definition of PMSI in the hanging paragraph"); *Graupner,* 537 F.3d at 1301 (applying Georgia UCC to Hanging Paragraph). Resorting to state law is necessary because when assessing the substance of property rights and security interests in bankruptcy "the basic federal rule is that state law governs." *Butner v. U.S.*, 440 U.S. 48, 57 (1979).

In this dispute, Colorado law governs the property rights between the parties and interpretation of the meaning of the phrase "purchase money security interest" since the Debtor purchased the Car in Colorado and the Contract provides for Colorado law. Both the Debtor and the Chapter 13 Trustee agree that a part of the Colorado Uniform Commercial Code, COLO. REV. STAT. § 4-9-103, dictates what qualifies as a purchase money security interest. The statute contains a specific definition of "purchase-money security interest," but the definition requires several cross-references. According to COLO. REV. STAT. § 4-9-103(b)(1):

> A security interest in goods is a purchase-money security interest: (1) To the extent the goods are purchase-money collateral with respect to that security interest . . . .

This definition uses the phrase "purchase-money collateral," which itself is defined as "goods . . . that secures a purchase-money obligation incurred with respect to that collateral." COLO. REV. STAT. § 4-9-103(a)(1). And, "purchase money obligation" means "an obligation incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." COLO. REV. STAT. § 4-9-103(a)(2).

In the balance of the statute, the Colorado legislature recognized a distinction between consumer-goods transactions and non-consumer-goods transactions. COLO. REV. STAT. § 4-9-103(e)-(h). A consumer-goods transaction means "a consumer transaction in which "[a]n individual incurs an obligation primarily for personal, family, or household purposes; and . . . [a] security interest in consumer goods secures the obligation." COLO. REV. STAT. § 4-9-102(24); *see also* COLO. REV. STAT. §§ 4-9-102(22), (23), (25), and (26) (related definitions of "consumer debtor," "consumer goods," "consumer obligor," and "consumer transaction.").

For non-consumer-goods transactions, Colorado adopted a dual status rule providing that "a purchase-money security interest does not lose its status as such, even if . . . [t]he purchase-money collateral also secures an obligation that is not a purchase-money obligation." COLO. REV. STAT. § 4-9-103(f)(1). But, the situation is a little less clear for consumer-goods transactions. For consumer-goods transactions, the Colorado legislature gave substantial deference to courts. COLO. REV. STAT. § 4-9-103(h) states:

> The limitation of the rules in subsection . . . (f) [the dual status rule] . . . of this section to transactions other than consumer-goods transactions is intended to leave to the court the determination of the proper rules in consumer-goods transactions. The court may not infer from that limitation the

11

> nature of the proper rule in consumer-goods transactions and may continue to apply established approaches.

Having identified the relevant statutory framework under the Colorado Uniform Commercial Code, the Court moves from generalities to the particulars of this dispute.

### 3. **The Parties Concede that Westlake Financial Does Not Have a Purchase Money Security Interest Securing the Portion of the Debt for Financing the GAP Insurance.**

Gap waiver, gap coverage, or gap insurance is a type of insurance which covers the gap between the amount due under an automobile loan and the proceeds of an insurance settlement and deductibles in the event that a vehicle is stolen or damaged resulting in total loss. *See Munzberg*, 388 B.R. at 543 ("Gap insurance covers that part of the damage that exceeds the value of the automobile, up to the outstanding balance of the secured loan.") It is purely optional. The Debtor asserts that the $295 in GAP Insurance was "a source of additional profit and lacks the 'close nexus between the acquisition of collateral [the Car] and the secured obligation' to rank as a PMSI [purchase money security interest]" under the Hanging Paragraph and Colorado state law.[32] As evidentiary support, the Debtor relies on the Contract which confirms that the purchase of the GAP Insurance was not required to purchase the Car (unlike the other additional charges such as the delivery and handling fee and filing fees paid to public officials).[33] The Court assumes that the $295 in GAP Insurance purchased by the Debtor (or some portion thereof) remains part of the debt still owing to Westlake Financial.[34]

Whether the debt related to the GAP Insurance qualifies as a purchase money security interest under the Hanging Paragraph and Colorado law is a very difficult legal question that requires careful parsing of COLO. REV. STAT. § 4-9-103. Only two Courts of Appeals have considered the issue and each reached the same conclusion under virtually identical provisions of the Uniform Commercial Code adopted in other states: car dealers and lenders may obtain a purchase money security interest for debt financed to pay gap insurance. *Dale*, 582 F.3d at 573-75 (under Texas UCC, gap insurance financed in connection with purchase of a vehicle constitutes a "purchase-money obligation" secured by a "purchase-money security interest" in the vehicle); *Price*, 562 F.3d at 628 n.5 (under North Carolina UCC, secured creditor has a "purchase-money security interest" in a vehicle as security for financing gap insurance). This seems to be the dominant view. *See also In re Manor*, 569 B.R. 764, 767 (Bankr. W.D. Wis. 2017) (under Wisconsin UCC, gap insurance financed as part of car purchase met "requirements of the purchase-money security interest definition."); *In re Ford*, 387 B.R. 829 (Bankr. D. Kan. 2008), aff'd *Ford*, 574 F.3d 1279 (implicitly assuming, but without analysis, that gap insurance was purchase money security interest).

---

[32] Docket No. 34 at 4.
[33] Stip. Fact Nos. 11 and 12.
[34] Neither the Debtor nor the Chapter 13 Trustee offered the Court any evidence concerning the current status of the GAP Insurance and whether it still forms part of the debt owed to Westlake Financial.

However, other courts have disagreed about whether debt for purchase of gap insurance is a purchase money security interest. *See Ford Motor Credit Co. LLC v. Miller (In re Miller)*, 431 B.R. 308, at *4 (10th Cir. BAP 2009) (unpublished table decision) (under Kansas UCC, "GAP insurance policy . . . . does not fall within the purview of 'purchase money security interest'"). Most courts coming out that way relied on a trial level decision, *In re Price*, 363 B.R. 734, 745 (Bankr. E.D.N.C. 2007), for analysis of gap insurance issues. *See e.g. Munzberg*, 388 B.R. at 543-44 (under Vermont UCC, "gap insurance is not part of the purchase price of the collateral, and thus does not come within the scope of the debt secured by a PMSI"). However, the trial level decision on gap insurance in *Price*, 363 B.R. 734, was later overruled by the United States Court of Appeals for the Fourth Circuit. *Price,* 562 F.3d at 629. Thus, most of the case law holding that debt for purchase of gap insurance is not a purchase money security interest now seems somewhat suspect.

Although the proper characterization of the debt for the GAP Insurance (as a purchase money security interest or not) is a tough issue, the Court need not decide it now because it is not in dispute in this case. The Chapter 13 Trustee has conceded the point to the Debtor and stated: "[The Chapter 13] Trustee agrees with Debtor that the GAP insurance policy is not a PMSI because it lacks the 'close nexus between the acquisition of collateral and the secured obligation.'"[35] Thus, the Court simply assumes (without deciding) that the portion of the debt owed to Westlake Financial for financing the GAP Insurance is not a purchase money security interest under Colorado law and the Hanging Paragraph.

### 4. **Westlake Financial Has a Purchase Money Security Interest Securing the Remaining Debt for Financing the Car and Additional Charges.**

The balance of the Westlake Financial Claim (exclusive of that portion of the debt attributable to financing the GAP Insurance) is for financing the purchase price of the Car, including the $299 delivery and handling fee and the $37.20 in filing fees paid to public officials. Since the purchase of the Car was for the personal use of the Debtor, the financing under the Contract was advanced to buy the Car, and the Car serves as collateral for the loan, the remaining debt owed to Westlake Financial is a classic purchase money security interest under Colorado law (COLO. REV. STAT. § 4-9-103) and, therefore, the Hanging Paragraph. Even the Debtor appears to concede the point by not arguing otherwise.

### 5. **The Purchase Money Security Interest Part of the Debt Is Not Destroyed by the Non-Purchase Money Security Interest Part of the Debt.**

As currently framed, most of the debt represented by the Westlake Financial Claim is a purchase money security interest — but a small sliver related to the GAP Insurance is not. The Debtor rests her main legal challenge on that dichotomy. She contends that the

---

[35] Docket No. 35 at 4.

13

GAP Insurance part of the debt secured by the Car (which is not a purchase money security interest) destroys or transforms the entire debt secured by the Car so that none of it remains a purchase money security interest subject to the Hanging Paragraph. The Debtor puts it this way: "once an automobile lender includes extraneous charges (such as GAP insurance), the safety extended by the *hanging paragraph* disappears."[36] If that argument is correct, then the Debtor would be free to cram down the debt owed to Westlake Financial just as she proposed in the Chapter 13 Plan.

The Debtor argues that the Court should embrace the "transformation rule" for purchase money security interests and reject the "dual status rule." The "transformation rule" "holds that a security interest that is part purchase-money and part non-purchase money completely loses its purchase-money character and is entirely 'transformed' into a non-purchase-money security interest." *Graupner*, 537 F.3d at 1300 (describing transformation rule); *see also Ford*, 574 F.3d at 1288 (explaining transformation rule in similar terms). On the other hand, the "dual-status rule" "allows the court to treat the purchase-money portion as purchase-money, while the non-purchase-money portion remains non-purchase-money." *Graupner*, 537 F.3d at 1300; *In re Jones*, 583 B.R. 749, 758 (Bankr. W.D. Wash. 2018) ("The 'dual status rule' allows part of a loan to have purchase money status, while the remainder is secured by a regular security interest.")

The Colorado legislature expressly adopted the "dual status rule" for non-consumer-goods transactions. COLO. REV. STAT. § 4-9-103(f)(1) ("a purchase-money security interest does not lose its status as such, even if . . . [t]he purchase-money collateral also secures an obligation that is not a purchase-money obligation."). That provision, however, does not apply to consumer-goods transactions such as the Debtor's purchase of the Car. For consumer-goods transactions, the Colorado legislature affords courts discretion. COLO. REV. STAT. § 4-9-103(h).

The Court sees no reasoned legal basis to treat consumers and non-consumers differently with respect to this issue. Indeed, the Colorado legislature's use of the phrase "to the extent that" in defining a "purchase-money security interest" strongly supports the "dual status rule" for all types of transactions. COLO. REV. STAT. § 4-9-103(b)(1) ("A security interest in goods is a purchase-money security interest: (1) [t]o the extent that the goods are purchase-money collateral with respect to that security interest . . . .").

Fortunately, the Court's job in choosing between the competing legal approaches (or something else) is much easier because of binding appellate precedent as well as very persuasive prior bankruptcy decisions construing the Colorado Uniform Commercial Code — all of which endorse the "dual status rule." The key Tenth Circuit decision is *Billings,* 838 F.2d 405. In that case, the appellate court construed the phrase "purchase money security interest" in the context of Section 522(f) and considered whether refinancing a purchase money debt in a consumer-goods transaction (*i.e.*, purchase of furniture on credit) caused the debt to lose its purchase money status. The Tenth Circuit adopted the "dual status rule" under the Colorado version of the Uniform Commercial Code:

---

[36] Docket No. 34 at 8.

14

> The problem with the first rationale — that the purchase money security interest cannot exist when collateral secures more than its purchase price — is that it ignores the precise wording of the Uniform Commercial Code. Section 9-107 of the U.C.C. provides that a security interest is a purchase money security interest "to the extent that" the loan enables the debtor to purchase new property. This language would be meaningless if an obligation could never be considered only partly a purchase money debt.

*Id.* at 408.[37]  To bolster its analysis, the appellate panel quoted favorably a lengthy passage from another appellate court:

> By overlooking that phrase ["to the extent"], the "transformation" courts adopt an unduly narrow view of the purchase-money security device. Their reasoning is inconsistent with the Commercial Code, which gives favored treatment to those financing arrangements on the theory they are beneficial both to buyers and sellers. By contrast, acceptance of the "dual-status" rule, with its pro tanto preservation of purchase-money security interests, is more in harmony with the [Bankruptcy] Code. Tolerance of "add-on" debt and collateral provisions, properly applied, carries out the approbation for purchase-money security arrangements . . . .

*Billings*, 838 F.2d at 408 (quoting *Pristas v. Landaus of Plymouth, Inc.*, 747 F.2d 797, 801 (3d Cir. 1984)).  Subsequently, the Tenth Circuit Bankruptcy Appellate Panel characterized the *Billings* holding as: "adopting the dual status rule, and noting '[district] and bankruptcy courts in this circuit, applying their understanding of the laws of most states in our circuit, have rejected the 'transformation' rationale, and have held that refinancing does not automatically transform a purchase money security interest.'" *Miller*, 431 B.R. 308, at *3 n.30 (quoting *Billings*, 838 F.2d at 409); *see also In re Ericksen*, 2006 WL 4846379, at *3 (Bankr. D. Utah Jul. 26, 2006) ("The Tenth Circuit Court of Appeals has rejected the transformation rule in favor of the dual status rule.")

Bankruptcy courts construing the Colorado Uniform Commercial Code, both before and after the *Billings* decision, also have endorsed the "dual status rule" for purchase money security interests in consumer-goods transactions.  In *Stevens v. Assoc. Fin. Servs. (In re Stevens)*, 24 B.R. 536 (Bankr. D. Colo. 1982), Bankruptcy Judge McGrath focused on the "to the extent that" language of the Colorado Uniform Commercial Code

---

[37]   The *Billings* panel relied on the "to the extent that" language of COLO. REV. STAT. § 4-9-107. However, the Colorado version of the Uniform Commercial Code was amended and renumbered after the *Billings* decision. As set forth above, the current operative text is located at COLO. REV. STAT. § 4-9-103(b)(1). Although there are some differences, the current text still retains the "to the extent that" provisions that the Tenth Circuit found dispositive.

15

definition of purchase money security interest and concluded: "there seems to be no requirement that the item [the collateral] secure only its purchase price." *Id.* at 538.[38] More recently, Bankruptcy Judge Campbell came to the same conclusion in *In re McCauley*, 398 B.R. 41 (Bankr. D. Colo. 2008), citing the *Billings* opinion. The *McCauley* court reasoned:

> The language used in the Colorado UCC's definition of PMSI itself seems to contemplate a "dual status" rule, when it states that a security interest in goods is a PMSI *"to the extent"* the goods secure an obligation incurred as all or part of the purchase price of the goods. C.R.S. § 4–9–103(b). If a security interest can be a PMSI to a certain extent, then it can also be a non-PMSI to the extent it does not fit the definition. Further, application of the transformation rule would appear to frustrate Congress' intent in enacting the hanging paragraph. It is evident that Congress wanted to prohibit debtors from being able to cram down secured claims for cars that they purchased within two and a half years prior to their Chapter 13 filing. Applying a strict transformation rule would penalize a vehicle lender for extending additional unsecured credit as a convenience to new car buyers. No apparent purpose would be served by penalizing lenders who choose to undertake such transactions.

*Id.* at 47 (emphasis in original).

The Chapter 13 Trustee relies heavily on the *McCauley* case in advocating for adopting the "dual status rule."[39] However, the Debtor contends that "*McCauley* was abrogated by *Ford* and is no longer good law."[40] After carefully considering the issue, the Court concurs with the Chapter 13 Trustee. The *McCauley* opinion consists of two parts. In the first part, the court decided that the "negative equity financing of a trade in" could not be considered a purchase money security interest under the Colorado Uniform Commercial Code and the Hanging Paragraph. *McCauley*, 398 B.R. at 45-46. Then, having decided that the creditor's debt included both a purchase money security interest and a non-purchase money security interest (*i.e.*, the negative equity), the court addressed the second part: whether to apply the "'transformation' or 'dual status' rule." *Id.* at 46-47. As noted above, the *McCauley* court endorsed the "dual status rule."

Subsequently, in *Ford*, 574 F.3d 1279, the Tenth Circuit decided the negative equity question differently. The appellate court majority decided that negative equity financing of a trade in as part of a vehicle purchase transaction qualified as a purchase

---

[38] As in the *Billings* decision, the *Stevens* court relied on a prior version of the definition of a purchase money security interest. COLO. REV. STAT. § 4-9-107. The current operative text is located at COLO. REV. STAT. § 4-9-103(b)(1) and still retains the "to the extent that" provisions that the *Stevens* court found important.
[39] Docket Nos. 21 and 35.
[40] Docket No. 34 at 5.

money security interest under the Kansas Uniform Commercial Code. *Id.* at 1285. Thus, the Tenth Circuit determined that the Hanging Paragraph barred a debtor from cramming down the entire secured debt for purchase of the vehicle. While the Tenth Circuit effectively abrogated the first part of the *McCauley* decision pertaining to negative equity in automobile transactions, the appellate court did not reject the second part of the *McCauley* decision dealing with the "dual status rule." In fact, the *Ford* majority simply had no need to address the "dual status rule" because it found that the entire debt (including even a component for gap insurance) was a purchase money security interest. So, the Court concludes that the *McCauley* court's endorsement of the "dual status rule" is still valid and persuasive.

In addition to the *Billings, Stevens,* and *McCauley* decisions all adopting the "dual status rule" as a matter of the Colorado Uniform Commercial Code, the Court also notes that multiple other intra-circuit decisions endorse the "dual status rule." *Ericksen*, 2006 WL 4846379, at *3 ("The Court has reviewed *Billings* carefully and finds its reasoning persuasive . . . . In view of this reasoning and the fact that no other state in the Tenth Circuit appears to have followed the transformation rule . . ., this Court elects to apply the dual status rule . . . ."); *In re Burt*, 378 B.R. 352, 364-65 (Bankr. D. Utah 2007) (finding that all debt associated with the purchase of the vehicle was purchase money security interest but "if the Court were to apply dual status rule in this case, the purchase money portion of [the creditor's claim]. . . is protected from cram down"); *In re Vega*, 344 B.R. 616, 622 n.29 (Bankr. D. Kan. 2006) (applying Kansas UCC, "the dual-status rule applies in both commercial and consumer contexts").

Notwithstanding the foregoing, the Debtor contends that in *Ford*, 574 F.3d 1279, the "10th Circuit analyzed, considered, and ultimately declined to adopt a 'dual-status' rule." (Docket No. 34 at 4.) The Debtor's argument is flat wrong. The Tenth Circuit majority in *Ford* decided that the entire debt (including negative equity and gap insurance) was a purchase money security interest under Kansas law and the Hanging Paragraph. There was no need to address the dual status rule at all. In fact, the majority decision in *Ford* never even refers to the terms "dual status rule" or "transformation rule." It is only in a dissenting opinion that one judge addressed the issue, contending that debt for negative equity financing should not be considered as a purchase money security interest. Having so concluded, the dissenting judge, now confronted with whether to adopt the "dual status rule" or the "transformation rule," argued for adoption of the "dual status rule" under the Kansas law (which version of the Uniform Commercial Code might more directly support the "dual status rule"). The Debtor simply mischaracterizes the *Ford* decision. 574 F.3d 1279.

Based upon the parties' legal briefing as well as the Court's own research, there are no reported decisions within the ambit of the Tenth Circuit which have adopted the "transformation rule." Instead, they all come out the other way. And, nationally, there are no reported decisions about the Hanging Paragraph deciding that the purchase of gap insurance is itself sufficient to destroy the purchase money security interest character of the principal debt incurred to buy a vehicle.

17

Thus, relying on the text of COLO. REV. STAT. § 4-9-103(b)(1), the binding *Billings* decision, the persuasive *Stevens* and *McCauley* opinions, and other precedent from courts within the Tenth Circuit, the Court concludes that the purchase money security interest portion of the debt owed to Westlake Financial is not destroyed or transformed by the nominal non-purchase money security interest portion of the debt attributable to financing the GAP Insurance.  Instead, the Court adopts the "dual status rule," and finds that the Hanging Paragraph applies to prohibit cramdown of the purchase money security interest portion of the debt owed to Westlake Financial.  Thus, the Court cannot confirm the Debtor's Chapter 13 Plan.

### 6.  **Calculation of the Amount of Debt Not Subject to Cramdown**.

The Debtor and the Chapter 13 Trustee agree that the portion of the debt owed to Westlake Financial for financing the GAP Insurance is not a purchase money security interest under Colorado law and the Hanging Paragraph.  Based upon that concession, and the Court's adoption of the "dual status rule," the Court must calculate how much of the Westlake Financial Claim is a purchase money security interest (protected from cramdown) and how much is a non-purchase money security interest (which may be crammed down).  COLO. REV. STAT. § 4-9-103(e) provides some guidance on the application of payments to debt in the context of non-consumer-goods transactions.  However, that provision is not applicable to consumer-goods transactions such as the Debtor's purchase of the Car.  COLO. REV. STAT. § 4-9-103(h).  Instead, the Court has discretion to decide a reasonable method of calculation.  *Id*.

The Chapter 13 Trustee advocates for the methodology explained in the *McCauley* decision:

> The existing secured obligation is divided into a PMSI and a non-PMSI, often by determining the percentage of the original loan which was attributable to the new car's financing.  This percentage is multiplied by the existing balance on the loan to quantify the amount of the secured claim that must be paid in full, with interest, under the hanging paragraph.  [The rest] . . . may be treated as an unsecured debt . . . .

*McCauley*, 398 B.R. at 46.  That methodology is commonly used by courts adopting the "dual status rule."  *See Jones*, 583 B.R. at 758-59; *In re Brodowski*, 391 B.R. 393, 403 (Bankr. S.D. Tex. 2008).  Notably, the Debtor has not offered any other approach to allocation of the debt.  So, the Court follows the *McCauley* methodology proposed by the Chapter 13 Trustee.

In this case, the total original loan under the Contract was $11,375.85.  The portion of the original loan attributable to the GAP Insurance was $295.  Converting to a percentage, the GAP Insurance part of the original loan constituted just 2.6% of the original loan while the remaining 97.4% of the original loan was directly for purchase of the Car and the additional charges.  Westlake Financial filed the Westlake Financial Claim for $10,537.08 (plus interest).  Applying the foregoing, a 2.6% portion of the

18

Westlake Financial Claim (which equals $273.96) is attributable to the GAP Insurance and is a non-purchase money security interest that may potentially be crammed down under Sections 506 and 1325(a)(5). However, the remaining 97.4% of the Westlake Financial Claim (which equals $10,263.12) is a purchase money security interest that may not be crammed down because of the Hanging Paragraph.

## VI. **Conclusion and Orders**.

For the reasons set forth above, the Court:

ORDERS that confirmation of Debtor's Plan is DENIED; and

FURTHER ORDERS that the Court will issue a separate order establishing the deadlines for the Debtor to file an amended plan consistent with this Order and the procedure for prosecuting such amended plan.

DATED this 25th day of August, 2020.

BY THE COURT:

_Thomas B. McNamara_
Thomas B. McNamara,
United States Bankruptcy Judge